**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

_____

| | |
|---|---|
| **CHRISTINA BRASCHER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  **CIVIL NO. 3:10CV256** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

_____

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This matter is before the Court for a report and recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) on cross-motions for summary judgment.[1]  Plaintiff, Christina Brascher, seeks

judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner

denying her application for Social Security Disability ("DIB") payments.  The Commissioner's

final decision is based on a finding by an Administrative Law Judge ("ALJ") that Plaintiff was

not disabled as defined by the Social Security Act ("the Act") and applicable regulations.

For the reasons discussed herein, it is the Court's recommendation that Plaintiff's motion

for summary judgment (docket no. 7) be GRANTED; that Defendant's motion for summary

judgment (docket no. 9) be DENIED; and that the final decision of the Commissioner be

---

[1] The administrative record in this case has been filed under seal, pursuant to Local Civil
Rules 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth
(except for year of birth), and any financial account numbers from its consideration of Plaintiff's
arguments and will further restrict its discussion of Plaintiff's medical information to only the extent
necessary to properly analyze the case.

REVERSED and REMANDED for further administrative proceedings in accordance with this report and recommendation.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on April 10, 2006, claiming disability due to sensory neuropathy, cerebral palsy, and hereditary motor-sensory neuropathy ("HMSN") Type II[2], with an alleged onset date of March 31, 2006.  (R. at 70-72, 85.)  The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[3]  (R. at 48-52; 54-55.)  On February 4, 2008, accompanied by counsel, Plaintiff testified before an ALJ.  (R. at 24-44.)  On February 12, 2008, the ALJ granted in part and denied in part Plaintiff's application, finding that she was not disabled under the Act prior to January 11, 2008, where after considering Plaintiff's age, education, work experience, and residual functional capacity there were a significant number of jobs in the national economy that she could have performed; but that she became disabled as of January 11, 2008.   (R. at 10-23.)  The Appeals Council subsequently denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.  (R. at 1-4.)

## II. QUESTION PRESENTED

---

[2] HMSN is defined as "any of a group of hereditary polyneuropathies involving muscle weakness, atrophy, sensory deficits, and vasomotor changes in the lower limbs."  Types I and II HMSN are "varieties of Charcot-Marie-Tooth disease [atrophy]."   Dorland's Illustrated Medical Dictionary 344, 1288 (31st ed. 2007).

[3] Initial and reconsideration reviews in Virginia are performed by an agency of the state government–the Disability Determination Services (DDS), a division of the Virginia Department of Rehabilitative Services–under arrangement with the SSA.  20 C.F.R. Part 404, Subpart Q; see also § 404.1503.  Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

Is the Commissioner's decision that Plaintiff is not entitled to benefits prior to January 11, 2008 supported by substantial evidence on the record and the application of the correct legal standard?

## III. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971); Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

In order to find whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary.'" Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Craig, 76 F.3d at 589. In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Breeden v. Weinberger, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has

made an error of law, the district court must reverse the decision. <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required in order to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; <u>Mastro</u>, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" (SGA).[4] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. <u>Id.</u> If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); <u>see also</u> 20 C.F.R.404.1520(c). In order to qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal

---

[4] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

effect on one's ability to function.  20 C.F.R. § 404.1520(c).  At the third step, if the claimant has

an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result

in death, it constitutes a qualifying impairment and the analysis ends.  20 C.F.R. §§ 416.920(d),

404.1520(d).  If the impairment does not meet or equal a listed impairment, then the evaluation

proceeds to the fourth step in which the ALJ is required to determine whether the claimant can

return to her past relevant work[5] based on an assessment of the claimant's residual functional

capacity (RFC)[6] and the "physical and mental demands of work [the claimant] has done in the

past."  20 C.F.R. §§ 416.920(e), 404.1520(e).  If such work can be performed, then benefits will

not be awarded.  Id.  However, if the claimant cannot perform her past work, the burden shifts to

the Commissioner at the fifth step to show that, considering the claimant's age, education, work

experience, and RFC, the claimant is capable of performing other work that is available in

significant numbers in the national economy.  20 C.F.R. §§ 416.920(f), 404.1520(f); Powers v.

Apfel, 207 F.3d 431, 436 (7th Cir. 2000) (citing Bowen v. Yuckert, 482 U.S. 137, 146, n.5

(1987)); Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The Commissioner can carry his

burden in the final step with the testimony of a vocational expert ("VE").  When a VE is called

---

[5] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved.  20 C.F.R. §§ 416.965(a), 404.1565(a).

[6] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR-96-8p.  When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  Id.  (footnote omitted).

to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all the claimant's impairments so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform.  Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).  Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful."  Id.  If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## IV.  ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset of her disability.  (R. at 17.)  At steps two and three, the ALJ found that Plaintiff had the severe impairments of cerebral palsy, cervical degenerative disc disease status post fusion, HMSN Type II, and seizures, but that these impairments did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for the award of benefits at that stage.  (R. at 17-19.) The ALJ next determined that Plaintiff had the RFC to perform sedentary work with the exception that she would be limited to non-concentrated exposure to hazards/heights.  (R. at 19-21.)

The ALJ then determined at step four of the analysis that Plaintiff could not perform her past relevant work as a teacher's aide because of the level of exertion required.  (R. at 21.)  At step five, after considering Plaintiff's age, education, work experience and RFC, and after consulting a VE, the ALJ nevertheless found that prior to January 11, 2008 there were other occupations which existed in significant numbers in the national economy that Plaintiff could

perform. (R. at 21-22.) Accordingly, the ALJ concluded that Plaintiff was not disabled prior to January 11, 2008, and was employable such that she was not entitled to benefits before that date. (R. at 22.) However, beginning on January 11, 2008, the date Plaintiff's age category changed to an individual closely approaching advanced age, there were not a significant number of jobs in the national economy that Plaintiff could perform. Accordingly, the ALJ concluded that Plaintiff became disabled and entitled to benefits as of January 11, 2008. (R. at 22-23.)

Plaintiff moves for a finding that she is entitled to benefits as a matter of law, or in the alternative, she seeks reversal and remand for additional administrative proceedings. (Pl.'s Mot. for Summ. J.) In support of her position, Plaintiff argues that: (1) the ALJ failed to properly consider whether Plaintiff's impairments, or the combination thereof, satisfied the requirements of any Listing; and (2) the ALJ's analysis of Plaintiff's credibility is not supported by substantial evidence and is based upon improper standards of evaluation. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 8-22.) Defendant argues in opposition that the Commissioner's final decision is supported by substantial evidence and application of the correct legal standard such that it should be affirmed. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") at 10-24.)

A.    **The ALJ's finding that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any Listing is not supported by substantial evidence.**

Plaintiff contends that the ALJ failed to consider whether the combination of her cerebral palsy and peripheral neuropathies met, medically equaled, or "equal[ed] in severity" any Listing impairment. (Pl.'s Mem. at 8-12.) Plaintiff argues that the ALJ should have sought the input of a medical expert ("ME"), and the failure to do so constitutes reversible error. (Pl.'s Mem. at 10-

12.)  Plaintiff further asserts that substantial evidence does not support the ALJ's finding that her impairments do not meet the requirements of Listing 11.07[7] (cerebral palsy) or 11.14[8] (peripheral neuropathies).  (Pl.'s Mem. at 13-15.)

When evaluating a claimant's disability application, the ALJ is required to include in the text of the decision a statement of the reasons for that decision.  42 U.S.C. § 405(b); 5 U.S.C. § 557(c); Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986).  In Cook, the Fourth Circuit found that the ALJ did not adequately explain the reasons for the determination that Cook's impairments did not meet or equal a listed impairment.  783 F.2d at 1172-73.  Consequently, the Court "simply [could] not tell whether [the] decision [was] based on substantial evidence or not." Id. at 1172.  The Court also noted that "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record."  Id. at 1173.  Finally, the Court noted that the ALJ must make a "specific and well-articulated finding as to the effect of the combination of impairments," and that in Cook's case, it was reversible error that the ALJ made only independent evaluations of her impairments.  Id. at 1174 (citing Combs v. Weinberger, 501 F.2d 1361, 1363 (4th Cir. 1974); Hicks v. Gardner, 393 F.2d 299, 302 (4th Cir.

---

[7] Cerebral palsy.  With:
   A.  IQ of 70 or less; or
   B.  Abnormal behavior patterns, such as destructiveness or emotional instability; or
   C.  Significant interference in communication due to speech, hearing, or visual defect; or
   D.  Disorganization of motor function as described in 11.04B.
20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 11.07.  Plaintiff concedes that she does not meet subsections A, B, or C, but that her cerebral palsy is severe enough to satisfy subsection D.  (Pl.'s Mem. at 13.)

[8] Peripheral Neuropathies.  With disorganization of motor function as described in 11.04B, in spite of prescribed treatment.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 11.14.

1968)).

Here, the ALJ's analysis at step three is insufficient and not supported by substantial evidence. First, the ALJ does not mention the combination of Plaintiff's impairments, except in his general conclusion that Plaintiff did not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments." (R. at 18.) Such a statement is only conclusory, and does not enable this Court to discern the reasoning for reaching such a determination. The same applies to the ALJ's conclusory statement that Plaintiff "does not have disorganization of motor function as described in section 11.04B," as required to satisfy Listing 11.07 or 11.14. (R. at 19.) The ALJ's statement that Plaintiff's records "do not substantiate that level of severity," without further discussion, cannot legitimately serve as the factual basis for finding that Plaintiff's impairments do not satisfy a Listing. (R. at 19.)

Listings 11.07 and 11.14 both require that Plaintiff demonstrate "disorganization of motor function as described in 11.04B." 11.04B requires "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and sation."[9] As noted, the ALJ found that the record did not substantiate "that level of severity," but he failed to identify specific evidence, medical or

---

[9] Section 11.04B also directs the reader to Section 11.00C:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. *The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.*

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 11.04B (emphasis added).

otherwise, supporting such a conclusion.  (R. at 19.)  Such a failure is made even more notable

when one considers other evidence of record which appears to support a finding that Plaintiff

may indeed suffer from "significant and persistent disorganization of motor function in two

extremities."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 11.04B.  Though Defendant asserts

that Plaintiff's "bald assertions" that she meets or equals a Listing do not qualify her for a

finding of disability "without more explanation and record corroboration," the same rationale is

applicable to the ALJ's similarly "bald assertion" that Plaintiff does *not* satisfy a Listing.  (Def.'s

Mem. at 17.)

 While Defendant refers to evidence that allegedly supports a conclusion that Plaintiff

does not satisfy a Listing, such evidence was not properly addressed in the ALJ's decision.

(Def.'s Mem. at 14-19.)  Defendant asserts that the medical record demonstrates that Plaintiff

suffers only from "mild" life-long cerebral palsy, mild sensory ataxia, that her conditions had

responded to treatment, and that Plaintiff was generally doing "well."  (Def.'s Mem. at 11, 15-

16; R. at 157-60, 165-66, 174-75, 180-87.)  However, the ALJ did not address any of these

allegations in his step three analysis.  (R. at 18-19.)  While the ALJ briefly discussed physicians'

comments that Plaintiff "appeared well" or "felt well" at step two of the analysis, he also

seemingly disregarded a physician's report which stated that Plaintiff was "permanently

disabled" and "unable to physically perform her job."  (R. at 17-18, 161-62.)  While an ALJ is

not required to accept such conclusory statements, as the ultimate determination of disability is

one reserved to the Commissioner, the ALJ here failed to provide any indication that he even

considered such statements in reaching his decision.  Indeed, that very physician also advised

Plaintiff to obtain a handicapped placard and use a cane, and stated that Plaintiff should not

operate a vehicle.  (R. at 157, 160, 165, 175.)

Moreover, Plaintiff's records demonstrate that she struggled with her symptoms and limitations even before ceasing employment in March of 2006.  Plaintiff received a work slip for no strenuous activity approximately one week before she left her position as a teacher's aide.  (R. at 143.)  In October of 2005, Plaintiff's physician recommended that she use a cane to ambulate, because she was prone to stumbling and suffered from postural instability as a result or the painful parasthesis of her feet, but Plaintiff declined to use a cane.  (R. at 165.)  In December of 2005, treatment records reflect that Plaintiff reported that it was "getting harder and harder for her to get around," that she did not feel safe driving, and that she did not know when she was on the brake pedal or gas pedal.  (R. at 160.)  Indeed, her physician agreed that "given [Plaintiff's] proprioceptive difficulties in her feet, she has a very positive Romberg test,[10] that she really should not be driving."  (R. at 160.)  He went on to state that her ability to "go from gas to break [sic]" was "quite limited," but that she could consider utilizing hand controls in the future.  (R. at 160.)  Finally, it was noted that Plaintiff's pain was affecting her moods and that she experienced sedation from her current medication regime.  (R. at 160.)  It was on this visit that her physician, Dr. Erwin, opined that Plaintiff was permanently incapacitated physically for the further performance of any duty.  (R. at 162.)  Specifically, Dr. Erwin stated that he did not anticipate any recovery, and that pain medication would hopefully help Plaintiff symptomatically, but that such medication would not necessarily allow her to function better.  (R. at 161-62.)

---

[10] A Romberg test is "an indication of loss of the sense of position in which the patient loses balance when standing erect, feet together, and eyes closed." The Free Dictionary, available at: http://medical-dictionary.thefreedictionary.com/Romberg's+test (last visited Mar. 11, 2011).

In February of 2006, Plaintiff's medical records indicate that adjustments to her medication regime were made on a continuing basis. (R. at 159.) Moreover, the records also disclose that she experienced side effects, including feeling tired during the day, requiring her medication to be adjusted again. (R. at 159.) In June of 2006, two months after Plaintiff's alleged onset date, records indicate that Plaintiff was intolerant to the previous medication adjustment implemented but only four months prior. (R. at 158.) The record further reflects that Plaintiff reconsidered obtaining a cane for her stability problems. (R. at 158.)

In October of 2006, records reflect that Plaintiff reported frequent extensor spasms which "on occasion have thrown her to the ground." (R. at 157.) Notes indicated that although Plaintiff had a difficult time increasing her medication dosage (she experienced "a lot of sedation"), it seemed that she had "taken well to it this time however." (R. at 157.) As a result of her reported extensor spasms, Plaintiff's physician completed a form for her to obtain a handicapped placard. (R. at 157.) He further advised that when she was taken to a shopping mall, it would be better if she were closer to the door rather than have to walk a long distance. (R. at 157.) Plaintiff's physician again advised her to obtain a cane and adjusted her medication, noting that if Plaintiff did not tolerate the increased dosage well, that they would transition to Zanaflex, a "sedating medication" they had avoided to that point. (R. at 157.)

In January of 2007, treatment records reflect Plaintiff's continued need to have her medication regime adjusted. (R. at 186.) Though her physician stated that she was "walking a bit better, less likely to fall," Plaintiff continued to experience painful parasthesis and was rendered unable to operate a vehicle because she "[did] not have the coordination necessary...because of this spasticity/periodic spasming." (R. at 186.) Approximately four

months later, Plaintiff returned to her physician after suffering a seizure the day before. (R. at 184.) Upon examination, it was noted that Plaintiff "[appeared] well," but that she claimed to feel dizzy and lightheaded. (R. at 184.) During the course of the examination, Plaintiff became "quite tachycardic"[11] and was sent to a hospital emergency room after being advised not to drive, operate heavy machinery, work alone in high places, or perform any activity which in the event of loss or alteration of consciousness could prove harmful to herself or others. (R. at 184-85.)

A month after the seizure, Plaintiff returned to her physician who noted that she appeared "well." (R. at 175.) Dr. Erwin also noted that Plaintiff was having some difficulty sleeping at night and was in a non-driving status for at least six months. (R. at 175.) Dr. Erwin further noted that one of Plaintiff's medications, Cymbalta, may have been a contributing factor to her seizure, and that this was "unfortunate" as it was "the only medication that has somewhat helped [Plaintiff] with her neuropathic pain." (R. at 175.) Accordingly, Plaintiff's medication regime was again adjusted. (R. at 175.) On Plaintiff's last documented visit, November 26, 2007, treatment notes reflect that she had no further problems on the lower dosage of Cymbalta, but that she felt "too foggy" on her current dosage of Lyrica. (R. at 174.) Plaintiff also repeated that her pain was worst at nighttime. (R. at 174.) As a result, her medication regime was adjusted yet again. (R. at 174.)

Such evidence demonstrates Plaintiff's continued suffering with regard to her severe impairments. Nevertheless, at step two of the analysis, the ALJ only briefly noted such evidence and focused instead on the conclusory physician statements that Plaintiff was doing "well." (R.

---

[11] Tachycardic is defined as having a rapid heart rate. Dorland's Illustrated Medical Dictionary 1891(31st ed. 2007).

at 19.)  Plaintiff's physicians did indeed state as much, but on one instance in the same visit, after stating that she "appeared well," the physician involved sent her to an emergency room because she was "quite tachycardic."  (R. at 184-85.)  Therefore, it is not sufficient to focus on the simple phrase of "doing well" while disregarding the remainder of the physician's report. The ALJ also stated that Cymbalta helped relieve Plaintiff's painful polyneuropathy.  (R. at 18.) Again, such a statement is correct, but the ALJ failed to note that Plaintiff's dosage of such was lowered because it may have been a contributing factor to the cause of her seizure.  (R. at 175.) The ALJ's failure to take into consideration the entirety of the medical record appears to be a "picking and choosing" of only the evidence that supported his ultimate conclusion, and a rejection of the substantial evidence that detracted from it.  Harris v. Comm'r of Soc. Sec., No. 2:04cv513, 2005 WL 1162530 at *8 (E.D. Va. May 12, 2005) (quoting Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000)); see also Switzer v. Heckler, 742 F.2d 382, 385 (7th Cir. 1984). Furthermore, the phrase "doing well" is relative and should be viewed in the context of the illness a person suffers from.[12]

Plaintiff's case is analogous to the case of Broyles v. Barnhart.  No. 3:03cv1029, 2005 WL 1048732 (E.D. Va. May 4, 2005).  In that case, the plaintiff suffered from residuals of a

---

[12] See Hutsell v. Massanari, 259 F.3d 707, 712-13 (8th Cir. 2001) (noting that the Commissioner "erroneously relied too heavily on indications in the medical record that Hutsell was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity"); Gude v. Sullivan, 956 F.2d 791, 793-95 (8th Cir. 1992) (noting that even though the plaintiff was "doing well" for someone who suffered from systemic lupus erythematosus ("SLE"), she still experienced symptoms consistent with the general course of SLE); Fleshman v. Sullivan, 933 F.2d 674, 676 (8th Cir. 1991) (noting that it was very likely for a person "to do well" after surgery for a kidney transplant, but the fact that Fleshman's body "did not reject the transplanted organ speaks well of [her] determination to survive, but it did not compel nor support a finding that [she] was not disabled").

traumatic brain injury, but the ALJ found that his impairments were not severe enough to meet or medically equal a Listing.  Id. at *6.  The plaintiff objected to that finding, and focused his argument on his "significant" disorganization of motor function in two extremities.  Id. at *7-8.  The plaintiff cited Luckey v. U.S. Dept. of HHS in support of his argument, in which the Fourth Circuit held that when a claimant for benefits satisfied a disability listing, benefits were due notwithstanding any prior efforts to work despite the claimant's handicap.  810 F.2d 666, 669 (4th Cir. 1989); Broyles, 2005 WL 1048732 at *7.  The ALJ in Broyles placed great emphasis on the fact that the plaintiff successfully performed SGA for at least fourteen consecutive years despite his physical ailments, which the Commissioner argued demonstrated an absence of persistent disorganization of motor function.  2005 WL 1048732 at *8.  The Court noted, however, that "the mere fact that [the plaintiff's] condition [had] not worsened since the period of time when he was able to obtain and perform [SGA] [did] not prevent his current impairment from meeting a medical listing."  Id.  The Court also noted that the plaintiff's entire right side was subject to the traumatic brain injury he suffered as a child, and that it was "insignificant that [he] was able to overcome total disorganization simply because he could use his left hand."  Id. at *8-9.  Further, the Listing in question did not require a "recent worsening" of symptoms, though it appeared that the plaintiff's condition was indeed worsening.  Id.  The Court ultimately remanded the case for payment of benefits because the record appeared to be "uncontroverted" that the plaintiff satisfied the requirements of Listing 11.18.  Id. at *10.  In addition to medical evidence and the plaintiff's contentions, the record included a letter from a Social Services agency, which "validate[d] the fact that [the plaintiff] had a severe condition that prevented him from working at the level of his peers and that his condition was gradually worsening with the

consequence that he was unable to perform at what was once 'his best.'" Id. at *9-10. The Court

further noted that although the plaintiff "struggled against all odds," he could not overcome the

obstacles that he had to encounter.  Id. at *10.

Here, as discussed earlier, it likewise appears that the record demonstrates that Plaintiff

meets or medically equals the requirements of a Listing.  However, Plaintiff's case differs in that

a remand in order to calculate benefits would not be appropriate.  In cases where the outright

award of benefits has been ordered, the record was sufficiently clear that the plaintiff satisfied a

Listing such that a remand for further analysis was unnecessary.  See Miller v. Comm'r of Soc.

Sec., No. 00-10386 BC, 2004 WL 1375545 at *6 (E.D. Mich. June 14, 2004) (noting that where

there is an adequate record the Commissioner's decision can be reversed and benefits awarded if

the decision is "clearly erroneous, proof of disability is overwhelming, or proof of disability is

strong and evidence to the contrary is lacking"); see also Gambill v. Bowen, 823 F.2d 1009,

1013 (6th Cir. 1987); Freeman v. Astrue, No. 7:07cv156, 2008 WL 3413305 (E.D.N.C. Aug. 8,

2008); Ianni v. Barnhart, 403 F. Supp. 2d 239, 257 (W.D.N.Y. 2005).

However, Plaintiff's case is one in which further development of the record would be

beneficial.  While Plaintiff has presented strong evidence supporting her contention that she

satisfies a Listing, the Court cannot conclude that proof of disability is "overwhelming" or

"strong and evidence to the contrary is lacking."  Miller, 2004 WL 1375545 at *6.  Indeed, there

is no evidence in the record that any physician ever opined on the level of severity of Plaintiff's

impairments.  See Smith v. Schweiker, 795 F.2d 343, 348 (4th Cir. 1986) (holding that a

physician's conclusion that the plaintiff satisfied 11.04B could not withstand the application of

11.00C, which is incorporated by reference and requires a consideration of the severity of the

disturbance of motor function, because the physician did not consider the severity of the plaintiff's impairment; accordingly there was insufficient evidence in the record to order a finding of disability); see also Austin v. Massanari, 162 F. Supp. 2d 517, 526, 528 (W.D. La. 2001).

In cases like Plaintiff's, where the record is lacking, the ALJ has a duty to address any deficiency and conduct a proper evaluation. See Jones v. Barnhart, 364 F.3d 501, 505 (3rd Cir. 2004).[13] The ALJ can fulfill his duty to complete the record by utilizing the services of a medical advisor, which should have been done in this case initially. See Smith, 795 F. 2d at 346-48; Austin, 162 F. Supp. 2d at 525. The ALJ also could have requested a more detailed opinion from Plaintiff's treating physician which would have addressed the severity of Plaintiff's limitations. Instead, the ALJ summarily dismissed the medical evidence, Plaintiff's statements, and an opinion from her physician that she was disabled.

Accordingly, upon remand the ALJ should consult a medical advisor, as a "personal examination" is needed to fully assess Plaintiff's impairments. See Smith, 795 F.2d at 346. Such examination should include statements which address the terms used in 11.04B and the severity of Plaintiff's disorganization of motor function. Karman, 2010 WL 2087878 at *8. The ALJ should then provide an analysis regarding whether Plaintiff's impairments satisfy a Listing. A one-sentence conclusion with no factual support is insufficient. The ALJ should also consider the effect of the combination of Plaintiff's impairments, as it is not clear that he did so in this

_____

[13] See also Clark v. Comm'r of Soc. Sec., No. 2:09cv417, 2010 WL 2730622, at *17 (E.D. Va. June 3, 2010); Karman v. Astrue, No. 09-0968-cv, 2010 WL 2087878, at *8-9 (W.D. Mo. May 24, 2010); Freeman, 2008 WL 3413305 at *2; Terry v. Astrue, No. 7:06cv00683, 2007 WL 2688232, at *3 (W.D. Va. Sept. 10, 2007); Ianni, 403 F. Supp. 2d at 255; Nowlen v. Comm'r of Soc. Sec., 277 F. Supp. 2d 718, 725 (E.D. Mich. 2003).

case.  The ALJ must provide an analysis of the supporting evidence for his conclusion so that a reviewing entity can understand the rationale for any conclusions reached.

### B.  The ALJ's credibility analysis is not supported by substantial evidence.

If, on remand, Plaintiff is found to have severe impairments that satisfy a Listing at step three, and is accordingly disabled and entitled to benefits, the credibility issue need and should not ordinarily be discussed.  However, because the Court is not recommending an outright award of benefits here, the credibility issued raised by Plaintiff can, and should be addressed.

Plaintiff contends that the ALJ's explanations for not finding Plaintiff entirely credible do not "withstand scrutiny."  (Pl.'s Mem. at 16.)  Plaintiff asserts that the ALJ was unable to differentiate between objective findings regarding her separate neurological impairments and that he placed too much emphasis on treatment records which simply indicated that Plaintiff was doing "well."  (Pl.'s Mem. at 16-18.)  Further, Plaintiff argues that the written statements she completed did not contain sufficient information "to impeach...or impugn her honesty, integrity and reliability in any way that the ALJ otherwise attempt[ed] to utilize them."  (Pl.'s Mem. at 19-20.)  Finally, Plaintiff contends that the ALJ erroneously failed to properly assess Plaintiff's strong work history and work ethic.  (Pl.'s Mem. at 20-21.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC.  20 C.F.R. §§ 416.920(e)-(f), 416.945(5)(1).  The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.  In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis.  Craig v. Charter, 76 F.3d 585, 594 (4th Cir. 1996); see also SSR 96-

7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a).  The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms.  Id.; SSR 96-7p, at 1-3.  The ALJ must consider all the medical evidence in the record.  Craig, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; see also SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added).  If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work.  Craig, 76 F.3d at 595.  The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements.  Craig, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations.  See Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997).  The Court of Appeals for the Fourth Circuit (as the immediate controlling appellate authority for this Court) has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'"  Id. (quoting NLRB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983)).  Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'"  Id. (quoting NLRB v. McCullough Envtl. Servs., Inc., 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. See Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Craig, 76 F.3d at 591.

An ALJ "cannot 'pick and choose' only the evidence that supports his position." Dash v. Astrue, No. 3:09cv433, 2010 WL 1779971 (E.D. Va. Apr. 13, 2010); Harris v. Comm'r of Soc. Sec. 2005 WL 1162530 at *8 (E.D. Va. May 12, 2005) (quoting Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000)); see also Switzer v. Heckler, 742 F.2d 382, 385 (7th Cir. 1984). Here, the ALJ discussed certain aspects of the record that contributed to his overall assessment of Plaintiff's credibility, but he disregarded and did not even reference other evidence that appears to corroborate Plaintiff's allegations of pain and its limitations, including the treatment records of multiple physicians.

The ALJ noted that the medical record, with its evidence of "mild weakness" and reports that Plaintiff was doing "well," did not support her alleged level of disability. (R. at 21.) The ALJ also noted that Plaintiff's written statements did not support her testimony, stating that Plaintiff indicated on such forms that she had no problems with completing tasks, concentrating, understanding, or following instructions; she paid her bills and could handle bank accounts; she prepared meals daily; and she did housecleaning and laundry weekly. (R. at 21.) In a more detailed assessment, the ALJ referenced Plaintiff's statements that she washed dishes, made beds, and did laundry daily; and dusted, mopped, swept, and vacuumed weekly. (R. at 21.)

The ALJ's reasons for discrediting Plaintiff are insufficient to support his conclusion that Plaintiff was not entirely credible. A review of the record indicates that Plaintiff consistently reported the extent of her impairments. The ALJ appears to assign great weight to the fact that Plaintiff could perform some household chores and cook. (R. at 21.) The Court cannot find Plaintiff's written statements to be so markedly different than her hearing testimony; nor can the Court adhere to such a wanting credibility analysis. Plaintiff does not contend that she suffers mentally, save for the drowsiness and ill side effects she suffers from when taking her medication. (R. at 32, 41, 104-05, 123-25.) Instead, Plaintiff has repeatedly asserted that she suffers physically, namely from problems with her feet. (R. at 31-33, 35-36, 40, 100, 102, 107-08, 116, 121, 123-25.)

On May 14, 2006, Plaintiff indicated that she could not walk around the block because of her feet; if she is on her feet "a lot" during the day she cannot sleep because they hurt; that preparing dinner meals takes "a while" because she has to rest from standing on her feet; that she falls "a lot" because she cannot feel her feet; that she loses her balance and has a hard time driving because of her numb feet; that if someone takes her shopping she can only go for an hour at most; that she has a hard time walking; that she has pain in her feet and nerve damage that is permanent; that a heating pad and staying off her feet helps relieve her pain, but that it never goes away; and that she had experienced such limiting pain for about two years. (R. at 99-108.)

Five months later, Plaintiff reported virtually the same complaints. (R. at 115-24.) Plaintiff also indicated that she had to have someone assist her in putting on shoes because she could not feel her feet; that she only performed some cleaning and laundry once a week (as opposed to previously doing such chores twice a week (R. at 101)); that she could only shop for

a half-hour and had to use a cane when doing so; that if she was "going for a while" she used a walker; that her pain had gotten worse over the last two years; that she was on medication, but it had not alleviated her pain or it had side effects that made her "very sleepy"; that she did not want to quit her job but had to because of the problems with her feet and it being "too dangerous" to drive a car; and that "it was getting harder and harder" to do her job.  (R. at 115-24.)

In February of 2007, Plaintiff indicated that she cooked, washed dishes, made the bed, and did laundry daily; she dusted, mopped, swept, and vacuumed weekly; she went shopping weekly or less than weekly with assistance; she did not drive and could not use public transportation; her medication made her sleepy; she did not sleep well because of pain in her feet; when working, she left work early to take her medication and required breaks or rest periods beyond the normally allotted breaks to alleviate the pain in her feet; and she could not focus or perform certain duties while on her medication at work.  (R. at 125-30.)

Approximately one year later, at her hearing before the ALJ, Plaintiff testified that she could not drive because of the pain in her feet and that she had not driven since she left her job; that she could not function while on her medication at work; that she had chronic pain in her feet and legs; that medication "[took] the edge off" her pain somewhat, but it also caused side effects; that she falls "a lot"; that she used a cane, but was hesitant to do so at first for fear of people staring at her; that she could stand for five minutes and walk for three; that she had weakness in her right side from her cerebral palsy; that her medicine had recently been adjusted in efforts to help her sleep better; that her husband sometimes took her shopping, but that her mother usually went instead; that she did "some" of the cooking; that she tried to clean, but could not clean like

she "used to be able to"; that her doctor told her operations/treatments/procedures would not help her impairments; that her doctor advised her not to walk a lot and not to drive; that she was administered a handicapped sticker; that her doctor was trying different kinds of medication because she still experienced pain and side effects; and that she loved working at school, but was now "homebound" unless her husband took her out. (R. at 29-43.)

The Court cannot determine how Plaintiff's written statements differ from her testimony. Plaintiff essentially has made the same allegations and voiced the same concerns ever since she applied for disability benefits in 2006. If anything, the record demonstrates a progression of her symptoms. Plaintiff alleged that she had problems with her medications - such allegations are corroborated by medical evidence. Plaintiff testified to problems with her feet - Plaintiff has complained of such since at least March 31, 2006, if not beforehand. There is nothing in the record refuting Plaintiff's claims of severe pain in her feet and legs. Though the ALJ noted that Plaintiff cooked and performed household cleaning, Plaintiff also indicated that she did such at a slow pace and not like "she used to be able to." (R. at 38.) Indeed, her allegations are generally consistent throughout and corroborated by her medical record.

Accordingly, the ALJ's credibility analysis is both unsupported by substantial evidence and the result of the application of incorrect legal standards. On remand, should the ALJ reach step four of the analysis and need to perform a credibility analysis, the ALJ should conduct a proper analysis, taking into consideration all relevant factors. The Court therefore recommends that Plaintiff's case be remanded for further consideration.

## V.  CONCLUSION

Although the Court concludes that the record does not provide substantial evidence to

sustain the ALJ's conclusion that Plaintiff is not disabled, the Court is unable at the same time to recommend an outright award of benefits. The record is in need of further development with regards to the degree of severity of Plaintiff's disorganization of motor function, as well as a more thorough analysis of whether Plaintiff's impairments or the combination thereof satisfy a Listing. The Court also cannot make a finding on Plaintiff's credibility, as that is more properly assessed initially on the administrative level. The Court is mindful of the prolonged period of time that the matter has been pending and, therefore, if remanded, it is recommended that the ALJ expedite the process by reconsidering Plaintiff's application in light of this report; that Plaintiff's most recent medical records be reviewed; that a consultative examination be scheduled with appropriate medical testing if any material confusion or ambiguity is perceived in the resulting record; and that a final administrative decision be issued in which all findings are sufficiently articulated and substantiated, including any credibility determinations, as would be sufficient for possible judicial review.

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment (docket no. 7) be GRANTED; that Defendant's motion for summary judgment (docket no. 9) be DENIED; and, that the final decision of the Commissioner be REVERSED and REMANDED for further administrative proceedings consistent with this report and recommendation.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and**

**recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a <u>de novo</u> review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____/s/_____
DENNIS W. DOHNAL
UNITED STATES MAGISTRATE JUDGE

Date: March 11, 2011
Richmond, Virginia